# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Kaitlin W.,[1]                                           Case No. 24-cv-06 (DJF)

                    Plaintiff,

v.                                                       **ORDER**

Martin J. O'Malley,
*Commissioner of Social Security Administration*,

                    Defendant.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kaitlin W. ("Plaintiff") seeks judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying their applications for Child Disability Benefits ("CDB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Decision"). This matter is before the Court on the parties' briefs. Because substantial evidence supports the Decision, the Court denies Plaintiff's request for relief (ECF No. 10), grants Defendant's request for relief (ECF No. 12), and dismisses this matter with prejudice.

# BACKGROUND

## I.    Plaintiff's Claim

Plaintiff applied for CDB and SSI on March 27, 2018. (Soc. Sec. Admin. R. (hereinafter "R.") 145-146, 436-440.)[2] At that time they were 19-years old, with a high school education and

---

[1] This District has adopted a policy of using only the first name and last initial of any nongovernmental parties in orders in Social Security matters.

[2] Copies of the Social Security administrative record (R.) are filed at ECF Nos. 6 and 9; they appear to be identical. The Court cites to ECF No. 9 because it is the most recent filing. For clarity, convenience, and ease of use, the Court cites to the record's pagination rather than the

prior work experience at a teacher's aide.  (R. 436, 462.)  Plaintiff alleged they became disabled on January 1, 2007 (R. 436, 439)—when they were eight years old[3]—resulting from type II bipolar disorder, generalized anxiety disorder, borderline personality disorder, major depressive disorder, social anxiety disorder, obsessive compulsive disorder, post-traumatic stress disorder, migraine headaches, and panic disorder (R. 461).

## II.    Regulatory Background

An individual is considered disabled for purposes of Social Security disability benefits if they are "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).   In addition, an individual is disabled "only if [their] physical or mental impairment or impairments are of such severity that [they] [are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   "[A] physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

The Commissioner has established a sequential, five-step evaluation process to determine whether an individual is disabled.  20 C.F.R. § 416.920(a)(4).  At step one, the claimant must establish they are not engaged in any "substantial gainful activity."  20 C.F.R. § 416.920(a)(4)(i).

---

Court's ECF and page numbers when citing to the Administrative Record.  All other citations refer to ECF docket and page numbers.

[3] To be entitled to CDB, a claimant must have a disability that began before they attained the age of twenty-two.  42 U.S.C. § 402(d)(1)(B).

The claimant must then establish at step two that they have a severe, medically determinable impairment or combination of impairments.  20 C.F.R. § 416.920(a)(4)(ii).  At step three, the Commissioner must find the claimant is disabled if the claimant has satisfied the first two steps and the claimant's impairment meets or is medically equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1 ("Listing of Impairments" or "Listing").  20 C.F.R. § 416.920(a)(4)(iii).[4]

If the claimant's impairment does not meet or is not medically equal to one of the impairments in the Listing, the evaluation proceeds to step four.  The claimant then bears the burden of establishing their residual functional capacity ("RFC") and proving that they cannot perform any past relevant work.  20 C.F.R. § 416.920(a)(4)(iv); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000).

If the claimant proves they are unable to perform any past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform other work existing in a significant number of jobs in the national economy.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).  If the claimant can perform such work, the Commissioner will find the claimant is not disabled.  20 C.F.R. § 416.920(a)(4)(v).

## III.   Procedural History

The Commissioner denied Plaintiff's applications for CDB and SSI initially (R. 198-202) and on reconsideration (R. 209-215).  On November 18, 2021, at Plaintiff's request (R. 216), an Administrative Law Judge ("ALJ") held a hearing on Plaintiff's application (R. 60-86).  The ALJ held a supplemental hearing on August 31, 2022 (87-128).  Plaintiff, a medical expert, and a

---

[4] The Listing of Impairments is a catalog of presumptively disabling impairments categorized by the relevant "body system" affected.  *See* 20 C.F.R Part 404, Subpart P, App. 1.

vocational expert testified at each hearing on November 18, 2021 (R. 60, 87).[5]  Plaintiff also had

non-attorney representative at each hearing.  (R. 60, 87.)

During their first hearing, Plaintiff testified that they could not work due to severe physical

and mental impairments, including chronic pain because of fibromyalgia and migraine headaches,

"really bad" interpersonal relationship issues, sensory issues, and difficulty with concentration.

(R. 65-74.)  They also testified that they had trouble walking due to pain, falling and requiring use

of a cane, dizziness, and issues with sitting, standing, and walking.  (R. 65 74.)  During their second

hearing, Plaintiff testified that they could not work due to intolerance of being around others,

inability to remember instructions, trouble tolerating stress, angry outbursts resulting in property

damage, hallucinations, and delusions.  (R. 96- 106.)  They also stated that their legs got numb

when they used the toilet, they could not wipe themselves properly because of difficulty reaching,

they sometimes forgot how to swallow food, their hands sometimes stopped working, they often

felt dizzy and shaky, and they felt anxious about medications and food.  (R. 96-106.)

After the hearing, the ALJ determined that Plaintiff does not have medically determinable

bipolar disorder, attention deficit hyperactivity disorder, autism spectrum disorder, headache

disorder, fibromyalgia, or dissociative disorder.  (R. 27-33.)  The ALJ did find that Plaintiff has

non-severe gender dysphoria and suffers from multiple physical and mental impairments, which

at least in combination are severe: obesity, generalized anxiety disorder with panic symptoms,

obsessive compulsive disorder, post-traumatic stress disorder, major depressive disorder,

schizoaffective disorder, and borderline and avoidant personality disorder.  (R. 26-27.)  The ALJ

---

[5] Following the first hearing, the ALJ sent an interrogatory to a different medical expert,
Michael Lace, Psy.D.  (R. 37, 89.)  Plaintiff's representative subsequently requested a
supplemental hearing.  (*See* R. 89.)  The August 31, 2022 hearing followed, during which Dr. Lace
testified.  (*See* R. 87.)

found Plaintiff has a mild limitation in understanding, remembering, or applying information; and moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself.  (R. 33-35.)  But the ALJ found Plaintiff's mental impairments do not severely limit any broad area of functioning.  (R. 33-36.)  The ALJ concluded that Plaintiff's impairments, alone or in combination, do not meet or medically equal any impairment in the Listing.  (R. 33-36.)

At step four of the sequential analysis, the ALJ thoroughly catalogued the mental and physical health evidence in the record (R. 36-49) and determined that Plaintiff has:

> the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except no exposure to dangers to life or limb in the workplace and not required to work in high, exposed places.  With regard to concentration, persistence and pace, no work in excess of simple, routine, repetitive tasks; occasional changes in work setting; no public interaction; brief and superficial interaction with supervisors/coworkers meaning, the 5th digit of the "Dictionary of Occupational Titles" ("DOT") code is a "6,", "7" or "8"; no complex decision-making; and no rapid, assembly-line paced work (daily quotas but not hourly quotas).

(R. 36.)

Next, the ALJ found Plaintiff has no past relevant work.  (R. 49.)  The ALJ then evaluated whether Plaintiff can perform any other jobs that exist in significant numbers in the national economy.  (R. 49-50.)  Based the second vocational expert's testimony, and considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff is able to perform such other jobs, including: "table worker" (DOT #739.687-182, at specific vocational preparation ("SVP") level 2, with approximately 26,000 jobs in the national economy); "inspector" (DOT #726.684-110, at SVP 2, with approximately 9,000 jobs in the national economy); and "sorter" (DOT #521.687-086, at SVP 2, with approximately 9,000 jobs in the national economy). (R. 50; *see also* R. 116, vocational expert's testimony during August 31, 2022 hearing.)  The ALJ

concluded on that basis that Plaintiff is not disabled.  (R. 49-50.)  The Appeals Council denied

Plaintiff's request for review of the ALJ's Decision (R. 5-11), and this lawsuit followed.

## DISCUSSION

### I.      Standard of Review

The Court's review of the Commissioner's Decision is limited to determining whether the

Decision is "supported by substantial evidence on the record as a whole."  *McKinney v. Apfel*, 228

F.3d 860, 863 (8th Cir. 2000).  "Substantial evidence … is more than a mere scintilla."  *Biestek v.*

*Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted).  It is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Id.* (quoting *Consol. Edison*

*Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  This "threshold … is not high."  *Id*.  "If, after reviewing

the record, the court finds it is possible to draw two inconsistent positions from the evidence and

one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision."

*Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (quotation omitted).

Remand is warranted, however, when the ALJ's opinion contains insufficient factual

findings that "considered in light of the record as a whole, are insufficient to permit [the] Court to

conclude that substantial evidence supports the Commissioner's decision."  *Scott ex rel. Scott v.*

*Astrue*, 529 F.3d 818, 822 (8th Cir. 2008); *see also Chunn v. Barnhart*, 397 F.3d 667, 672 (8th

Cir. 2005) (remanding because the ALJ's factual findings were insufficient for meaningful

appellate review).  At minimum, the ALJ must build a logical bridge between the evidence and the

RFC he creates.  He does so by "includ[ing] a narrative discussion describing how the evidence

supports each conclusion."   Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7.

"[T]he [ALJ] must also explain how any material inconsistencies or ambiguities in the evidence

in the case record were considered and resolved."  *Id.*; *see also Lee R. v. Kijakazi*, No. 20-cv-1989

6

(BRT), 2022 WL 673259, at *4 (D. Minn. Mar. 7, 2022) (finding ALJ failed to create a "logical bridge" between the evidence and his conclusions); *Weber v. Colvin*, No. 16-cv-332 (JNE/TNL), 2017 WL 477099, at *26 (D. Minn. Jan. 26, 2019) (same).

## II.    Analysis

Plaintiff argues the ALJ erred at steps two and four of the sequential analysis when he: (1) did not find that Plaintiff's fibromyalgia and migraine headaches are medically determinable impairments (ECF No. 10 at 4-14; ECF No. 13 at 1-4); (2) misconstrued the nature and severity of Plaintiff's mental impairments by wrongly evaluating multiple medical opinions and improperly discounting Plaintiff's subjective complaints (ECF No. 10 at 14-25; ECF No. 13 at 4-11); (3) did not include manipulative limitations in Plaintiff's RFC; (ECF No. 10 at 24-26; ECF No. 13 at 11-12); and (4) failed to properly evaluate the opinions of multiple lay witnesses (ECF No. 10 at 26-27; ECF No. 13 at 12-13).   Plaintiff also argues the ALJ erred at step five of the sequential analysis because the jobs he identified: (1) were not based on an accurate RFC; and (2) exceeded even the ALJ's allegedly flawed RFC determination (ECF No. 10 at 28-30; ECF No. 13 at 13-14). Plaintiff therefore asks the Court to remand this matter for further proceedings before the Commissioner.  (ECF No. 10 at 30-31; ECF No. 13 at 15.)  Defendant asks the Court to affirm the Decision on the grounds that: (1) the ALJ applied the correct legal stands; and (2) substantial evidence supports his Decision.  (ECF No. 12 at 29.)

### A.    Alleged Errors at Steps Two and Four

At step two of the sequential analysis, it is the claimant's burden to establish that they have a severe, medically determinable impairment or combination of impairments.   20 C.F.R. § 416.920(a)(4)(ii); *see also Rickey P. V. v. Kijakazi*, No. 20-CV-2199 (JFD), 2022 WL 3214991, at *6 (D. Minn. Aug. 9, 2022) ("It is a claimant's burden to prove disability").   A physical or

mental impairment is medically determinable if it "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); *accord* 20 C.F.R. §§ 404.1508, 416.908 (to be considered a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."); 20 C.F.R. §§ 404.1529(b), 416.929(b) ("symptoms … will not be found to affect [a claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.")

"After [the Commissioner] establishes that [a claimant] has a medically determinable impairment(s), then [he] determine[s] whether [the claimant's] impairment(s) is severe."  20 C.F.R. §§ 404.1521, 416.921.  Although severity is not an onerous requirement, "it is also not a toothless standard, and [the Eighth Circuit has] upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing."  *Kirby v. Astrue*, 500 F.3d 705, 708 (8th Cir. 2007) (collecting cases).  A severe impairment significantly limits the claimant's physical or mental ability to perform basic work activities.  *See* 20 C.F.R. § 404.1520(c), 416.920(c).  By contrast, an impairment that is not severe establishes "only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work."  SSR 85-28.

At step four of the sequential analysis, the ALJ must determine Plaintiff's RFC.  RFC is defined as the most a claimant can do despite her limitations.  20 C.F.R. § 404.1545(a).  It is the claimant's burden to prove her functional limitations related to her RFC.  *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 n.5 (8th Cir. 2004).  The ALJ bears primary

responsibility for assessing a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and a claimant's own descriptions of the claimant's limitations.   *See* 20 C.F.R. § 404.1545(a)(3); *see also Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016); *Roberts v. Apfel*, 222 F.3d, 466, 469 (8th Cir. 2000).

As part of an RFC determination, the ALJ must "evaluate the persuasiveness of medical opinions by considering (1) whether they are supported by objective medical evidence, [and] (2) whether they are consistent with other medical sources …."   *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (citing 20 C.F.R. § 404.1520c(c)).   But "[n]o talismanic language is required for the ALJ to meet the requirements of [section] 404.1520c, only that the ALJ make it clear that they considered the supportability and consistency of an opinion."   *Mario O. v. Kijakazi*, No. 21 CV 2469 (NEB/ECW), 2022 WL 18157524, at *11 (D. Minn. Dec. 13, 2022), *report and recommendation adopted*, 2023 WL 136590 (D. Minn. Jan. 9, 2023).   Under regulations revised in 2017, an ALJ cannot defer or give any specific evidentiary weight, including controlling weight, to any medical opinion or prior administrative medical finding, including those from medical sources.  20 C.F.R. § 404.1520c(a); *see also Bowers v. Kijakazi*, 40 F.4th at 875 (citing 20 C.F.R. § 404.1520c(a), stating that "treating physicians are [no longer] entitled to special deference").

### 1.    Medically Determinable Impairments

Plaintiff argues the ALJ erred at step two of the sequential analysis by finding that Plaintiff's fibromyalgia and migraine headaches were not medically determinable impairments. (ECF No. 10 at 4-14; ECF No. 13 at 1-4.)   For the reasons given below, the Court disagrees.

### a.    Fibromyalgia

The ALJ concluded that Plaintiff's fibromyalgia was a not medically determinable impairment because it did not satisfy the criteria set forth under Social Security Ruling 12-2p (R.

27-28), which explains how the Social Security Administration evaluates fibromyalgia. *See* SSR 12-2p, 2012 WL 3104869, at *1 (Soc. Sec. Admin. July 25, 2012). To establish fibromyalgia as a medically determinable impairment under SSR 12-2p, the claimant must show that a physician diagnosed fibromyalgia. *Id.* at *2. The diagnosis alone is not enough, however. *Id.* The physician must also provide specific supporting evidence, such as a history of widespread pain for at least three months, at least eleven (out of eighteen) positive tender points bilaterally above and below the waist, repeated manifestation of six or more fibromyalgia symptoms or co-occurring conditions, or evidence that other disorders were excluded. *Id.* at *2-3. Additionally, if the physician's diagnosis is inconsistent with other evidence, then it may not establish a medically determinable impairment. *Id.* at *2.

The ALJ evaluated Plaintiff's evidence of fibromyalgia as follows:

> I find that the fibromyalgia is not a medically determinable impairment based on the evidence. Only one medical provider has identified vague tender points when examined. The claimant has not consistently reported wide spread chronic pain when seen by providers. Co-occurring symptoms are not clearly reported or defined, and other conditions are not excluded. In addition, physical examination findings do not clearly set out any functional physical limitations.

(R. 27.) The ALJ also noted that: (1) when Plaintiff applied for benefits in March 2018, Plaintiff did not allege disability based on fibromyalgia or any other pain, other than migraine headaches (R. 27, citing R. 460-473); (2) Plaintiff did not mention pain or fibromyalgia as a disabling condition in their July 2019 appeal (R. 27-28, citing R. 488-497); (3) a state agency physician who evaluated Plaintiff's allegations in August 2019 did not find any physical impairment (R. 28, citing R. 161-192); (4) in July 2017, Plaintiff was able to remain seated on a flight from Washington State to Minnesota with no reported physical issues (R. 28, citing R. 875); and (5) medical records from October 2017 showed no impairment in Plaintiff's gait (R. 28, citing R. 872-873). The ALJ added that: (1) the only physical issue Plaintiff reported to Jenna Viland, a family nurse practitioner

Plaintiff began seeing in late 2018, was migraine headaches (R. 28, citing R. 1227-1228); (2) when Plaintiff met with NP Viland again in February 2019, Plaintiff's physical complaints consisted of headaches and resolved right ankle pain (R. 28, citing R. 1224-1225); and (3) Plaintiff had several other benign medical examinations throughout the relevant period (R. 28-29, 43, citing R. 873, 995, 1164, 1166, treatment notes from October 2017 to July 2018 reflecting limited physical pain complaints, no gross neurological deficit, and self-reports of general good health).

The ALJ acknowledged that in June 2021, NP Viland referred Plaintiff to Dr. Kyle Sinclair—a rheumatologist—for back, shoulder, knee pain, and weakness in some joints.  (R. 29, citing R. 1480.)  The ALJ noted that: (1) Plaintiff reported to Dr. Sinclair they had suffered diffuse body pain for as long as they could remember, worsening over the last two years (R. 29, citing R. 1481); (2) Dr. Sinclair found that all of Plaintiff's tender points were positive, that Plaintiff had diffuse body pain, poorly controlled anxiety, depression, non-restorative sleep, and irritable bowel syndrome, and that Plaintiff's symptoms were consistent with fibromyalgia; and (3) Dr. Sinclair believed Plaintiff's mental health and poor sleep significantly contributed to Plaintiff's fibromyalgia.  (R. 30, citing R. 1480, 1483.)  But the ALJ further noted that Plaintiff was not taking medication for mental health at that time and had declined a prescription about ten months earlier because their mental health was stable enough to forgo medication.  (R. 30, citing R. 1414.)

The ALJ commented that: (1) Dr. Sinclair's exam showed Plaintiff was alert and appropriate, and although their joints were diffusely tender to palpation, they had no swelling, erythema, or increased warmth (Tr. 30, citing R. 1483); (2) Dr. Sinclair recommended continuing gabapentin, which had been helpful previously, and non-pharmacologic treatments such as Tai Chi or yoga and walking ten minutes multiple times a day (R. 30, citing R. 1483); and (3) although Dr. Sinclair also recommended weight loss and physical therapy for Plaintiff's knee pain, Plaintiff

declined his physical therapy referral (R. 30, citing R. 1480).  The ALJ observed, "Dr. Sinclair is the only individual to note positive tender points though he does not provide specific detail of the examination and what tender points he tested other than noting they were all positive."  (R. 30.)

The ALJ also considered Plaintiff's testimony about having trouble walking due to pain, falling, and requiring physical therapy to learn how to use a cane, inability to lift their arms, dizziness, and issues with sitting, standing, and walking (R. 37, 43).  But the ALJ noted that in May 2019, Plaintiff had normal sensation and motor skills and a normal gait and strength, and the record did not reflect use of any assistive walking device (R. 43-44, citing R. 1206, 1222).  The ALJ further noted that there were no changes in Plaintiff's gait in January 2021, and in March 2021, Plaintiff's gait was still normal with no difficulty walking tandem and on heels and toes (R. 30, 46, citing R. 1475).

Plaintiff argues the ALJ erred by wrongly evaluating Dr. Sinclair's medical opinion and contends that Dr. Sinclair's failure to identity Plaintiff's specific tender points was not a reasonable basis to reject his diagnosis.  (ECF No. 10 at 6-7; ECF No. 13 at 1-2.)  Plaintiff asserts that Plaintiff's lack of certain objective findings—such as an abnormal gait, neurological deficits, and impaired range of motion—is consistent with a fibromyalgia diagnosis and that the ALJ should not have attempted to interpret the findings himself or substituted his own opinion for that of a fibromyalgia specialist.  (ECF No. 10 at 7-8; ECF No. 13 at 2-3.)  Plaintiff further argues that the ALJ should not have faulted Plaintiff for failing to list fibromyalgia on their initial application for benefits or administrative appeal because Plaintiff only learned they had fibromyalgia after "a pattern of symptoms and co-occurring symptoms emerged—widespread muscle and joint pain, headaches/migraines, sleep disturbance, IBS, anxiety, depression."  (ECF No. 10 at 8; ECF No. 13 at 2.)  Plaintiff also contends that: (1) the ALJ wrongly attributed their symptoms to

uncontrolled depression and non-restorative sleep, but depression "is known to co-occur with fibromyalgia and non-restorative sleep is a sign/symptom of fibromyalgia" (ECF No 10 at 8); (2) Plaintiff did in fact report waxing and waning symptoms and system flares, both of which are consistent with fibromyalgia (ECF No. 10 at 9, citing R. 680); and (3) the ALJ wrongly discounted Plaintiff's testimony about fibromyalgia symptoms and limitations without explanation (ECF No. 10 at 9-10).   Finally, Plaintiff disputes any claim that they did not seek or follow any recommended treatment for their symptoms and asserts that "they consulted numerous medical providers and tried a variety of medications, most of which were either ineffective or caused intolerable side effects."  (ECF No. 10 at 10, citing R. 680.)

Having carefully reviewed the record, the Court concludes that the ALJ did not err when he found Plaintiff's fibromyalgia was not medically determinable.  The ALJ properly considered whether Plaintiff's fibromyalgia met the criteria under SSR 12-2p and concluded that it did not. (R. 27-31.)   The ALJ noted that: (1) Dr. Sinclair did not provide specific support for his fibromyalgia diagnosis (R. 30, *see also* R. 1480-1483, Dr. Sinclair's medical notes reflecting limited detail about the nature of the exam he conducted to diagnose Plaintiff's fibromyalgia or what specific tender points he tested); (2) Plaintiff did not consistently report widespread pain to other providers (R. 28, citing *e.g.*, R. 1222-1228, NP Viland's medical notes reflecting Plaintiff's physical pain reports limited to migraines and a sore ankle); (3) Plaintiff's medical examinations were routinely normal (R. 28-29, 43, citing R. 873, 995, 1164, 1166, treatment notes from October 2017 to July 2018 reflecting limited physical pain complaints, no gross neurological deficit, and self-report of general good health); (4) Plaintiff's medical notes conflicted with their testimony regarding their ability to ambulate (R. 30, 43-44, 46, citing R. 1206, 1222, 1475 medical notes reflecting normal gait/strength, sensation, and motor skills); and (4) Plaintiff did not

consistently follow through with treatment recommendations that could help mitigate fibromyalgia symptoms (R. 30, citing R. 1414, 1480, noting declining mental health medication and physical therapy).

The record therefore clearly supports the ALJ's finding that Dr. Sinclair's fibromyalgia diagnosis fails to satisfy SSR 12-2p because it is not well supported, it is inconsistent with other record evidence, and other conditions have not been clearly excluded. *See* SSR 12-2p, 2012 WL 3104869, at *1-3. Plaintiff's many arguments essentially ask the Court to reweigh the evidence, but that is not the Court's job. *Schmitt v. Kijakazi*, 27 F.4d 1353, 1361 (8th Cir. 2022) ("Despite [Plaintiff's] dissatisfaction with how the ALJ weighed the evidence, it is not this Court's role to reweigh that evidence"). Moreover, the issue "is not whether substantial evidence exists to reverse the ALJ," but "whether substantial evidence supports the ALJ's decision." *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)). Because substantial evidence supports the ALJ's finding that Plaintiff's fibromyalgia is not medically determinable, the Court must affirm it.

**b.     Migraine Headaches**

The ALJ also concluded that Plaintiff's headache disorder was: (1) not a medically determinable impairment (R. 27); and (2) non-severe (R. 29). He noted that Plaintiff denied headaches both in April and July 2018, and again in May 2022 (R. 28-29, citing R. 995, 1164, 1900-1901), and that when Plaintiff did report headaches, the headaches were situational and responded to medication. (R. 27-28.) For example, the ALJ considered that Plaintiff reported migraine headaches to NP Viland in late 2018, but noted that the headaches were stable, infrequent, and improved with medicine. (R. 28, citing R. 1227.) The ALJ also noted Plaintiff's complaint to NP Viland in February 2019 that they suffered headaches, but that the headaches were associated

exclusively with intercourse.  (R. 28, citing R. 1228.)  The ALJ further observed that in August 2019, Dr. Cliff Phibbs, M.D., evaluated Plaintiff's headaches and concluded they were non-severe because: (1) Plaintiff reported their headaches occurred exclusively just before and during orgasms; (2) the headaches resolved; (3) Plaintiff did not have a headache diagnosis; (4) Plaintiff did not take medication for their headaches; and (5) Plaintiff's neurological examinations in 2018 were normal.  (R. 28, citing R. 169, 185, 1224.)  The ALJ explained that he found Dr. Phibs's opinion persuasive because: (1) Dr. Phibbs is an expert in physical health and confined his evaluation to that area; (2) Dr. Phibbs reviewed the entire file available to him and provided a supportive explanation for his evaluation; and (3) Dr. Phibbs's opinion is consistent with the other evidence in the file showing Plaintiff's migraines improved or resolved with a change in medication and were related to specific situations only; and not work related activities.  (R. 28.)

The ALJ also considered that in April 2021, NP Viland completed school disability paperwork for Plaintiff due to migraines that allegedly occurred 3-4 times a month (R. 29, citing R. 1378); but noted that: (1) Plaintiff was not using medication to treat the headaches; (2) Plaintiff did not appear to suffer from other physical disabilities such as chronic widespread pain, inability to sit or stand for prolonged periods of time, or issues with ambulation (R. 29, citing R. 1377-1388); and (3) other evidence did not support any limits related to alleged headaches (R. 29, citing, *e.g.*, R. 995, 1900-1901, Plaintiff's denial of headaches in July 2018 and May 2022).

Finally, the ALJ considered Plaintiff's testimony at both steps two and four that Plaintiff's migraine headaches required them to lie down, but he noted the record did not reflect that Plaintiff ever reported that limitation to any medical provider.  (R. 29, 37.)  The ALJ thus concluded, "I find migraines are not severe because they would cause no more than mild limitations in work related functioning."  (R. 29.)

Plaintiff claims that in reaching his conclusions the ALJ wrongly overlooked: (1) their testimony that they suffered three to six migraines per month—each lasting eight to ten hours with lingering side effects—and that medication was no longer effective (ECF No. 10 at 11, citing R. 67, 96); and (2) NP Viland's opinion that Plaintiff suffered from headaches (ECF No. 10 at 11-12). Plaintiff argues there is no objective test for a primary headache diagnosis, so the ALJ should have relied more heavily on their testimony. (ECF No. 10 at 12.) Plaintiff also contends the ALJ overlooked evidence that Plaintiff did in fact seek treatment for migraine headaches and took medication to alleviate them. (ECF No. 10 at 12-13, citing R. 1392, 1399, 1402, 1473, 1509-10, 1557, 1969, 1972-73, 1975, 2003.)

The ALJ's conclusions are well-supported. As discussed above, a physical or mental impairment is medically determinable if it "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3); *accord* 20 C.F.R. §§ 404.1508, 416.908 (to be considered a basis for disability, a physical impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."). The ALJ cited substantial evidence that Plaintiff's reports of migraine headaches were not supported by medically acceptable clinical or laboratory diagnostic techniques. (*See, e.g.*, R. 28-29, citing R. 169, 185, 1224 (normal neurological findings, lack of headache diagnosis), R. 1377-1388 (lack of co-mitigating symptoms).) The ALJ also noted that Plaintiff denied having headaches more than once (R. 28-29, citing R. 995, 1164, 1900-1901), and that when Plaintiff did report headaches, they were situational and responded to medication (R. 27-28, citing R. 1227-1228). To the extent Plaintiff argues there is no objective test for migraines, the ALJ still properly weighed the conflict between Plaintiff's testimony and their self-

reports to providers on different occasions.  The ALJ was therefore well within his authority to conclude that Plaintiff's headaches were not medically determinable.  The ALJ's additional explanation, that even if Plaintiff *does* suffer from some type of headache disorder, it is non-severe—and would have no more than a minimal effect on their ability to work—only bolsters the logical bridge between the evidence and his Decision.

Plaintiff's arguments again center largely on how the ALJ overlooked certain evidence and failed to properly evaluate other evidence.  (ECF No. 10 at 11-14; ECF No. 13 at 3-4.)  But as discussed above, it is not the Court's job to reweigh the evidence.  *Schmitt*, 27 F.4d at 1361.  And the issue is not whether there is substantial evidence to reverse the ALJ's Decision, but whether there is substantial evidence to support it.  *Vossen*, 612 F.3d at 1015.  Because substantial evidence exists to support the ALJ's finding that Plaintiff's headaches are not medically determinable, the Court must affirm it.

### 2. The Severity of Plaintiff's Mental Impairments

Plaintiff next argues the ALJ "misconstrued the nature" of Plaintiff's severe impairments by improperly rejecting both the opinions of various mental health providers and Plaintiff's own testimony and subjective complaints.  (ECF No. 10 at 14-25; ECF No. 13 at 4-11.)  These alleged errors implicate both steps two and four of the sequential analysis.

To evaluate a claimant's mental impairments, an ALJ must assess four areas to determine how mental disorders limit functioning in a work setting: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. pt. 404, subpt.  P, app.  1, § 12.00.A.2.b.  Pursuant to the regulation, the ALJ must rate these areas based on a five-point scale including none, mild, moderate, marked, and extreme.  20 C.F.R. pt. 404, subpt.  P, app.  1, § 12.00.F.2.  An

ALJ's determination that a claimant suffers from one extreme limitation, or two marked limitations automatically triggers a disability finding. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00.F.2. An extreme limitation is the inability to function independently, appropriately, or effectively on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app. 1, § F.2.e. A marked limitation is a seriously limited ability to function independently, appropriately, or effectively on a sustained basis. 20 C.F.R. pt. 404, subpt. P, app. 1, § F.2.d. For certain Listings, including 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders), the ALJ must evaluate whether: (1) the disorder is "serious and persistent" meaning "a medically documented history of the existence of the disorder over a period of at least 2 years"; and (2) there is evidence of both ongoing medical treatment and marginal adjustment. 20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.04, 12.06.

At the first hearing, Plaintiff testified that their mental health symptoms included four to ten panic attacks per week, anger outbursts, irritability, crying, and self-harm. (R. 65-66, 68-70.) They stated that they did not go out alone, even to the grocery store (R. 73), and described symptoms associated with autism spectrum disorder including severe sensory reactions and non-verbal episodes (R. 68-69). They further testified that they did not tolerate even minor stress very well and had such trouble with focus and concentration that they could not follow the story line of a two-hour movie. (R. 70, 72.)

During the second hearing, Plaintiff testified that despite seeing a therapist at least once a week and taking psychotropic medication, they still had mental health symptoms. (R. 105.) They stated that their attention-deficit/hyperactivity disorder medication was not working, but they were very anxious about increasing the dose because of side effects. (R. 96.) They also testified that they: (1) had not been hospitalized since 2018 because of finding a supportive partner; (2) still had

anger outbursts, but had switched to throwing things and yelling instead of self-harm; (3) still had problems with other people and dealing with changes in routine; (4) rarely went out without another person or their service dog; and (5) could not remember instructions unless the instructions were very basic, written down, and included reminders. (R. 96-104.)

After weighing the evidence, the ALJ determined that none of Plaintiff's mental impairments resulted in one extreme limitation, or two marked limitations, in the four broad areas of functioning so as to automatically trigger a disability finding.

The ALJ found Plaintiff has only a mild limitation in understanding, remembering or applying information. (R. 33.) The Social Security Administration ("SSA") defines this functional area as the ability to learn, recall, and use information to perform work activities. 20 C.F.R. Part 404, Subpart P, Appendix E.1. The ALJ cited record evidence that Plaintiff: (1) could generally follow written and oral instructions, with occasional frustration depending on their anxiety level (R. 33, citing R. 503, 511, 523); (2) could use a computer (R. 33, citing R. 501); (3) had trained their service dog (R. 33, citing R. 876); (4) had just a mild impairment in organizing and thinking (R. 33, citing R. 652); (5) exhibited an organized thought process with intact memory and age-appropriate abstraction ability in February 2018 (R. 33, citing R. 1046); (6) did not demonstrate obvious mental impairment in December 2018 (R. 33, citing R. 1171); (7) demonstrated average cognitive functioning in February 2021 (R. 33-34, citing R. 1567); and (8) showed normal mentation in May 2022 (R. 34, citing R. 1901).

The ALJ found Plaintiff has a moderate limitation in adapting or managing oneself. (R. 35.) The SSA defines this functional area as the ability to regulate emotions, control behavior, and maintain well-being in a work setting. 20 C.F.R. Part 404, Subpart P, Appendix E.4. The ALJ cited record evidence that Plaintiff: (1) can pay some bills, count change, and use a checkbook and

savings account (R. 35, citing R. 521, R. 565-572); (2) can prepare simple meals and perform household chores (R. 35, citing R. 500, R. 520); (3) has no problem performing personal cares such as bathing and dressing (R. 35, citing R. 519); (4) takes care of household pets with some reminders (R. 35, citing R. 518); (5) lived independently in December 2018 (R.35, citing R. 1169); (6) showed fair judgment and good insight (R. 35, citing R. 1171, 1918); (7) was able advocate for themself to obtain accommodations in their college coursework (R. 35, citing R. 616); and (8) worked through trauma triggers in May 2021 (R. 35, citing R. 1362).

The ALJ also found Plaintiff has a moderate limitation in concentrating, persisting, or maintaining pace. (R. 34-35.) The SSA defines this functional area as the ability to focus attention on work activities and stay on task at a sustained rate. 20 C.F.R. Part 404, Subpart P, Appendix E.3. The ALJ cited Plaintiff's testimony that they maintained concentration on short daytime drives. (R. 34, citing R. 65, 95.) The ALJ cited other record evidence that Plaintiff can persist at: (1) performing household chores, watching television for up to thirty minutes and playing games on their telephone (R. 35, citing R. 502); (2) drawing, watercolor, taking pictures, making cupcakes, and spending time with their animals at least a few times a week (R. 34-35, citing R. 522); (3) occasionally finishing a task to completion (R. 35, citing R. 511); and (4) playing videogames (R. 35, citing R. 566). The ALJ further noted that: (1) in February 2018, Nancie Hamlett, MA, LP, observed that Plaintiff exhibited intact attention and calm motor activity (R. 35, citing R 1046); (2) Plaintiff demonstrated focus during an evaluation in December 2018 (R. 35, citing R 1171); (3) Plaintiff's alleged delusions and hallucinations were not present during a mental health visit in August 2020 (R. 35, citing R. 1304); and (4) Plaintiff displayed fair to good attention and was largely on task during diagnostic assessments in February 2021 and 2022 (R. 35, citing R. 1567, 2005).

20

Finally, the ALJ found Plaintiff has a moderate limitation in interacting with others. (R. 34.)   The SSA defines interacting with others as the ability "to relate to and work with supervisors, co-workers, and the public."  20 C.F.R. Part 404, Subpart P, Appendix E.2.  The ALJ cited evidence, including Plaintiff's testimony and self-reports, that they: (1) had been in a long-term relationship with someone since 2019 (R. 34, citing R. 93); (2) get along with some family members (R. 34, citing R. 102-103); (3) lived with a roommate (R.34, citing R. 64); (4) use Uber; (5) text others (R. 34, citing 1033); (6) see others in person every few weeks (R. 34, citing R. 519); (7) worked on a Halloween costume with friends in October 2020 (R. 34, citing R. 1329); (8) discussed career and education plans with friends and family in December 2020 (R. 34, citing R. 1335); (9) were pursuing—with their partner—an open relationship with a shared third person in May 2021 (R. 34, citing R. 1358); (10) were excited about expanding their social circle in August 2021 (R. 34, citing R. 1537); (11) attended a social event and had plans to attend a friend's wedding in August 2022 (R. 34, citing R. 2019); and (12) spent a lot of time with their boyfriend's best friend and partner (R. 34, citing R. 1579).

The ALJ also stated that he did not find any mental disorder to be serious and persistent, in part based on Plaintiff's living situation and limited treatment history.   (R. 35, citing R. 1563-1585, 1998-2021.)

### a.    Medical Experts

Plaintiff argues the ALJ's findings are erroneous because he improperly rejected the opinions of multiple mental health providers who opined that Plaintiff exhibited greater limitations in one or more of the four broad areas of functioning.  (ECF No. 10 at 14-20; ECF No. 13 at 4-7.)

### i.    Yukiko Nakajima, APRN

In June 2022, psychiatric nurse practitioner Yukiko Nakajima, APRN, determined that

Plaintiff suffered from post-traumatic stress disorder, general anxiety disorder, major depressive disorder, panic disorder, attention-deficit/hyperactivity disorder-combined type; autism spectrum disorder, and avoidant personality disorder, with symptoms of anxiety, depersonalization, dissociation, dysregulation, irritability, anger, difficulties with concentration and communication, inability to understand nonverbal communication, and restricted behaviors (R. 2023-24).   NP Nakajima opined that Plaintiff's condition was chronic and that they only had a minimal ability to: (1) perform repetitive, short-cycle work; (2) attain precise limits, tolerances, and standards; (3) follow specific instructions; (4) deal with people; (5) work alone or apart from others; (6) perform effectively under stress; and (7) be reliable/consistent.  (R. 2023.)  She also opined that Plaintiff: (1) had good days and bad days; (2) would require additional unscheduled work breaks; and (3) would miss more than three days of work per month due to their impairments. (R. 2025.)  In a concurrent mental status examination, NP Nakajima noted that Plaintiff: (1) was adequately groomed and cooperative; (2) demonstrated normal speech, goal-oriented thoughts, and fair insight; and (3) displayed just mild impairment in attention and memory and moderate impairment in concentrated and normal psychomotor activity.  (R. 2023.)  NP Nakajima also wrote a letter explaining that Plaintiff had difficulties with social interactions in multiple contexts and misunderstood social cues, causing significant stress and anxiety ("Letter") (R. 1637-1638).  She also explained that the duration of Plaintiff's dissociation and recovery from panic was difficult to estimate since Plaintiff was very dysregulated.  (R. 1637-1638.)

The ALJ considered NP Nakajima's Letter and opinion but found them unpersuasive as both unsupported by her own treatment notes and inconsistent with the record as a whole.  (R. 45.) The ALJ cited NP Nakajima's concurrent mental status examination as poor support for her opined limitations (R. 45, citing R. 2023).  He noted a lack of support in the record for the number of

absences from work NP Nakajima opined was necessary.  (R. 45, "[T]he claimant has failed to provide supportive evidence regarding the degree of absences as opined including the need to engage in frequent treatment that would take the claimant away from work, medication side effects that would prevent engagement in work, or the disruptions in mental status that would result in inability to attend work on a consistent basis.")  The ALJ further cited NP Nakajima's own treatment notes to show inconsistencies with the limitations she opined were necessary.  (R. 45-46.)  For example, he noted that: (1) NP Nakajima prescribed—and Plaintiff took—a  medication that helped with Plaintiff's anxiety and ability to sleep at night (R. 45, citing R. 1459-1460); (2) Plaintiff denied side effects in February 2021 and said their mood was okay (R. 45, citing R. 1460); (3) NP Nakajima's treatment records from November 2020 to February 2021 showed Plaintiff was alert, oriented, adequately groomed, had regular speech, "mood pretty good," affect almost full, logical, linear and goal-directed thoughts, was cooperative, pleasant, and calm, had good eye contact, did not respond to internal stimuli, fair attention and concentration, intact memory and language, normal abstraction, fair insight and judgment, grossly intact cognitively, and had an average fund of knowledge (R. 45-46, citing R. 1451-1452, 1460-1461); and (4) in February 2021, NP Nakajima noted Plaintiff's mood and anxiety were mostly stable and Plaintiff agreed to increase their medication dosage (R. 46, citing 1461).

These observations were appropriate.  An ALJ may consider conservative mental health treatment including therapy and medication management when assessing opinion evidence.  *A.S.A. v. Saul*, No. 20-cv-74 (ECW), 2021 WL 1062037, at *10 (D. Minn. Mar. 19, 2021).  An ALJ also may consider normal mental status exams when evaluating opinion evidence regarding mental impairments.  *Harrington v. Kijakazi*, No. 22-471 (JRT/ECW), 2023 WL 2524029, at *6 (D. Minn. Mar. 15, 2023).

The ALJ further noted that NP Nakajima's opined mental limitations were inconsistent with other record evidence. (R. 45.)  For example, he noted that: (1) when Plaintiff saw Dr. Georgios Emmanuel Manousakis in March 2021, they were alert, attentive, and oriented; language was coherent and fluent; and memory, comprehension, and ability to follow commands were intact (R. 46, citing R. 1474); and (2) Plaintiff could engage in numerous daily activities—*e.g.*, training and caring for animals, doing art work, and traveling to visit family out of state—that  required planning, focus, and ability to persist on a regular basis (R. 45, citing R. 875, 1086, 1189, 2003).

### ii.     Dr. Amy Carrison, Psy.D.

In May 2021, Dr. Amy Carrison, Psy.D., diagnosed Plaintiff with autism spectrum disorder ("ASD") based largely on Plaintiff's self-reports. (R. 1247-1260.)  Dr. Carrison explained that an ASD diagnosis is characterized by impairment in social interaction and communication and restrictive, repetitive, and stereotyped patterns of behavior, interests, and activities. (R. 1249.) She also stated that Plaintiff reported "doing some research on ASD [prior to their appointment] and feels they meet many of the diagnostic criteria." (R. 1247.)

The ALJ rejected Dr. Carrison's diagnosis, in part based on mental status exams she conducted that were inconsistent with it and otherwise failed to support it.  (R. 32, citing R. 1254, 1259.)  The mental status exams showed that Plaintiff appeared well kempt and calm, with intact thought processes; did not report hallucinations or delusions; demonstrated good attention, appropriate affect, normal mood, normal speech, intact memory, insight, and judgment; and appeared oriented. (R. 1254, 1259.)  The ALJ also noted that Dr. Carrison's ASD diagnosis was based largely on Plaintiff's self-reports, and that Plaintiff had researched the diagnostic criteria for ASD before meeting with Dr. Carrison.  (R. 32, citing R. 1247.)  The ALJ appropriately discounted the significance of Dr. Carrison's opinion on the ground that it was derived from

Plaintiff's own self-diagnosis.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (an ALJ may give less weight to an opinion based largely on subjective complaints).

### iii.     Dr. Andrew Krueger, Psy.D.

In June 2021, Dr. Andrew Krueger, Psy.D. diagnosed Plaintiff with generalized anxiety disorder, attention-deficit/hyperactivity disorder-combined type, ASD, persistent depressive disorder, post-traumatic stress disorder, and avoidant personality disorder.  (R. 1261-1268.)  His evaluation included interviewing Plaintiff and reviewing their prior treatment notes, a mental status exam, and various assessments and inventories.  (R. 1261.)  In the mental status exam, Dr. Krueger noted that Plaintiff was cooperative, with an anxious and tense mood, but fully oriented with normal thought processes.  (R. 1263.)  His other assessments showed Plaintiff scored in the below average to average range in memory and attention/concentration.  (R. 1267-1268.)

The ALJ rejected Dr. Krueger's findings in part on grounds that the treatment notes Dr. Krueger reviewed showed Plaintiff did not meet the full criteria for an attention-deficit/hyperactivity disorder or ASD.  (R. 32, citing R. 1261.)  The ALJ also cited Plaintiff's relatively normal mental status exam and low to average performance in memory and attention/concentration.  (R. 32, citing 1267-1268.)  And while the ALJ found that ASD was not a medically determinable impairment, he acknowledged the overlap in symptoms between different mental impairments and inherently subjective nature of diagnoses, and thus considered Plaintiff's psychological symptoms and the effect on Plaintiff's functioning, regardless of their diagnostic label.  (R. 33.)  The ALJ explained, "I fully accommodated for the claimant's impairments in interact[ing] with others, managing [themself] and stress, and trouble with stress/coping with limitations in the residual functional capacity that relate directly to these symptoms."  (R. 33.)

iv.     **Medical Experts-Dr. Cheryl Buechner, Ph.D., and Dr. Michael Lace, Psy.D.**

During Plaintiff's first hearing on November 18, 2021, the ALJ called Cheryl Buechner, Ph.D., to testify as a medical expert regarding Plaintiff's mental impairments.  (R. 74-81.)  At one point, Dr. Buechner testified that Plaintiff met the criteria for Listings 12.04 (depressive, bipolar, and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders).  She testified that Plaintiff had marked limitations in both interacting with others and concentrating, persisting, and maintaining pace, and a mild limitation in understanding, remembering or applying information (R. 79-80), but did not address Plaintiff's ability to adapt or manage themself.  Dr. Buechner also testified, however, that Plaintiff "did not fully meet" the criteria for any mental health listing. (R. 75.)  She further testified that Plaintiff appeared to meet the criteria for some listings based on Plaintiff's self-reports, but stated that Plaintiff's self-reports were inconsistent with their provider's observations and sporadic treatment.  (R. 75.)

Following Plaintiff's first hearing, the ALJ sent an interrogatory to a different medical expert, Dr. Michael Lace, Psy.D., regarding Plaintiff's mental impairments.  (R. 37, 89.)  During Plaintiff's second hearing on August 31, 2022, and consistent with his interrogatory response, Dr. Lace testified that Plaintiff was mildly limited in their ability to interact with others and moderately limited in the other three functional areas, and that no mental impairment appeared to be serious and persistent.  (R. 109-111.)

Plaintiff contends the ALJ wrongly credited Dr. Lace's opinions over Dr. Buecher's without a valid reason (ECF No. 10 at 19-20; ECF No. 13 at 7-8).  But the ALJ clearly explained he was not persuaded by Dr. Buechner's testimony because it was confusing, contradictory, and inconsistent with other record evidence.  (R. 48.)  The ALJ further explained that he found Dr. Lace's testimony persuasive for multiple reasons: (1) it was consistent with his interrogatory

response; (2) his interrogatory response and testimony were mutually supportive and held up under cross-examination; and (3) his opinions were consistent with other record evidence, including Plaintiff's daily living activities, course of treatment, and other providers' observations. (R. 48-49.)

### b.      The ALJ's Evaluation of the Medical Opinions

Having reviewed the record, the Court cannot conclude that the ALJ improperly evaluated any medical opinion.  The ALJ cited comprehensive record evidence to support his findings on the severity of Plaintiff's mental impairments and RFC and included in Plaintiff's RFC only those limitations he felt were supported by the record as a whole.  (R. 33-37.)  The ALJ clearly explained why he did or did not find each medical opinion persuasive in light of his own evaluation, and cited record evidence to support his conclusions.  (R. 32-33, 45-46, 48.)  The Court also notes that although the ALJ did not agree with every expert's recommended diagnosis, he nevertheless accommodated Plaintiff's mental health symptoms in their RFC.  (*See, e.g.*, R. 33, 36.)  Plaintiff's challenge to the ALJ's evaluation of the medical expert testimony equates to yet another disagreement with how the ALJ weighed the evidence.  This does not render the ALJ's findings erroneous as a matter of law, and it is not the Court's prerogative to second guess him so long as substantial evidence supports his findings. *Schmitt*, 27 F.4d at 1361.  Because substantial evidence supports the ALJ's evaluation of each contested medical opinion, the Court must affirm his findings. *Vossen*, 612 F.3d at 1015.

### c.      Plaintiff's Testimony and Subjective Complaints

Plaintiff also asserts various disagreements with how the ALJ interpreted the record and evaluated evidence, largely as it relates to Plaintiff's testimony and self-reports.  (ECF No. 10 at 20-25; ECF No. 13 at 8-11.)  For example, Plaintiff argues the ALJ erred by: (1) faulting

Plaintiff for "seeking" diagnoses of attention-deficit hyperactivity disorder and ASD; (2) wrongly assessing Plaintiff's anxiety and depression by discounting a statement they submitted to the Appeals Council; (3) misunderstanding why they switched providers or reduced therapy sessions; (4) finding that they quit mental health treatment in 2018; (5) not agreeing with Plaintiff's stated degree of mental health symptoms; (6) rejecting Plaintiff's testimony based on inaccurate information and unfounded inferences about their daily living activities; (7) finding that Plaintiff could travel by plane without issue; (8) overstating Plaintiff's ability to walk; and (9) overlooking the extent to which Plaintiff relies on their partner or service dog for support.  (ECF No. 10 at 20-25.)  These alleged errors also implicate both steps two and four of the sequential analysis.

Congress expressly prohibited granting disability benefits based entirely on a claimant's subjective complaints.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 416.929(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). Rather, when a claimant has produced objective evidence of an impairment that could reasonably cause his alleged symptoms, the ALJ evaluates the intensity and persistence of the symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *8.  The ALJ then must evaluate whether the claimant's subjective statements about their symptoms are consistent with: (1) the objective medical evidence; and (2) the other evidence in the record.  *See* 20 C.F.R. § 404.1529(c)(2)-(3); SSR 16-3p. Under SSR 16-3p, the ALJ may consider factors such as: (1) the objective medical evidence; (2) whether the medical evidence is consistent with the claimant's allegations; (3) medical source statements; (4) the claimant's daily activities; (5) the location, duration, frequency, and intensity of the claimant's symptoms; (6) aggravating or precipitating factors; and (7) medication, treatment,

and other measures to relieve pain.  SSR 16-3p.  But the ALJ need not discuss each factor.  *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017).

In this case, the ALJ stated that while he found Plaintiff's medically determinable impairments "could reasonably be expected to cause the alleged symptoms … [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the Decision]."  (R. 48.)  And, as set forth above, the ALJ applied the correct legal standards and his evaluation of Plaintiff's mental health impairments is permeated with citations to the record—including Plaintiff's own testimony and self-reports—supporting the ALJ's analyses and conclusions.  (*See supra* Sections II. A(1)(a)(b), (2)(a)(b); *see also, e.g.*, R.34, citing R. 64-65, 93, 95, Plaintiff's testimony; R. 1034, 1169, 1172, Plaintiff's self-reports.)  Plaintiff's arguments regarding the ALJ's evaluation of their testimony and subjective complaints—like their other challenges to the Decision—center on how the ALJ weighed the evidence.  As previously stated, the Court will not reweigh the evidence, *Schmitt*, 27 F.4d at 1361, and affirms the ALJ's analyses and conclusions related to Plaintiff's mental health impairments because substantial evidence supports them.  *Vossen*, 612 F.3d at 1015.

### 3.    Other Alleged Step Four Errors

Plaintiff also argues the ALJ erred at step four of the sequential analysis by: (1) failing to include manipulative limitations in their RFC (ECF No. 10 at 25-26; ECF No. 13 at 11-12); and (2) failing to properly consider lay testimony when determining Plaintiff's RFC (ECF No. 10 at 26-27; ECF No. 13 at 12-13).

### a.      Manipulative Limitations

As part of his step four analysis, the ALJ considered Plaintiff's manipulative abilities in determining Plaintiff's RFC.  (R. 46.)  He noted that in January 2022, Plaintiff demonstrated 5/5 strength in all their extremities (R. 46, citing R. 1706), and that they failed to report any issue with their hands at multiple medical appointments (R. 46, citing R. 1704-1709, neurology appointment; 1710-1715, sports medicine appointment; 1797-1806, neurology appointment; 1473-1476, neurology appointment).  The ALJ further noted Plaintiff's reports that they engaged in multiple activities that required the use of their hands, including playing the bass, working on arts and crafts, playing video games, and caring for a service animal.  (R. 46-47, citing, *e.g.,* R. 1762, playing the bass; R. 1774, caring for a service animal; R. 1780, playing video games; R. 2003, working on cross stitch, crochet, collage, sewing, painting, and digital art.)

Plaintiff argues the ALJ still should have included manipulative limitations in their RFC because they testified at their second hearing that they could not do work that required them to use their hands and that sometimes they could not hold onto things like utensils when they ate.  (ECF No. 10 at 25, citing R. 96, 101-02.)  Plaintiff contends the ALJ discounted Plaintiff's testimony based on the fact that Plaintiff is able to crochet and play the bass, but overlooked that: (1) Plaintiff can only crochet for small periods of time; (2) it hurts their hands to crochet; (3) limited amounts of knitting and crocheting are often recommended for people with hand pain to keep their joints from becoming stiff; and (4) their ability to play the bass is very limited and takes very little hand strength.  (ECF No. 10 at 25-26; ECF No. 13 at 12-13.)

Plaintiff clearly disagrees with how the ALJ weighed the evidence, but that does not negate the fact that substantial evidence supports his findings on Plaintiff's manipulative abilities.  (*See* R. 46, citing Plaintiff's ability to use their hands in multiple contexts.)  While Plaintiff would have

preferred the ALJ focus more heavily on Plaintiff's testimony, the Court once again declines Plaintiff's improper invitation to reweigh the evidence.  *Schmitt*, 27 F.4d at 1361.  Because substantial evidence supports the ALJ's findings, the Court must affirm them.  *Vossen*, 612 F.3d at 1015.

### b.  Lay Testimony

As part of his RFC determination, the ALJ also considered statements from Plaintiff's grandmother, partner, and caseworker—Virginia Robinson, Reiichi Hanson, and Grace Gauthier, respectively—each describing Plaintiff's symptoms and functional limitations.  (R. 38-39; *see also* R. 488-497, 498-505, 517-425, 565-575, 1587, third-party statements.)  The ALJ observed that these "opinions" were "not medical source statements and are considered as other evidence." (R. 38.)  The ALJ further reasoned, "While [the opinions] are generally supportive of a finding of severe impairments with concordant limitations, I did not find them persuasive as to supporting greater limits or disabling limits based on their inconsistency with the record as a whole including the school records and treatment notes of medical providers."  (R. 38.)  The ALJ noted that: (1) Mr. Hanson and Ms. Robinson have significant personal relationships with Plaintiff that may color their opinions in Plaintiff's favor; (2) neither Mr. Hanson nor Ms. Robinson is a medical provider, and it is unclear whether they had the opportunity to review other evidence in Plaintiff's file; (3) Ms. Gauthier's opinion appeared to be based largely on Plaintiff's subjective reporting, rather than Ms. Gauthier's own observations; and (4) Ms. Robinson had at times questioned the severity of Plaintiff's symptoms.  (R. 38-39, citing R. 963, Ms. Robinson questioning severity of Plaintiff's symptoms to provider; R. 565-572, 1587, Ms. Gauthier's opinion limited to Plaintiff's subjective reporting.)

Plaintiff maintains the ALJ erred in rejecting the statements of these three lay witnesses by overlooking the purpose of lay testimony and rejecting it for invalid reasons, including the witnesses' lack of medical expertise and their personal relationships with Plaintiff.  (ECF No. 10 at 26-27; ECF No. 13 at 15-16.)  The Court finds that although the third-party statements at issue were not medical opinions, the ALJ properly considered them as "other evidence" under 20 C.F.R. § 404.1545(a)(3).  (R. 38.)  The Court further concludes that it was appropriate for the ALJ to consider Plaintiff's personal relationships with the witnesses when evaluating their opinions. *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) ("[A]n ALJ is not required to accept a statement from a witness who will benefit financially from a determination of disability …." (citation omitted)).  It was also appropriate for the ALJ to discount testimony he felt was inconsistent with the record as a whole.  *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) ("[A]n ALJ properly may give less than controlling weight to lay-witness statements that are inconsistent with the record.").

The ALJ specifically observed that he found the lay witness opinions to be inconsistent with the record as a whole, including Plaintiff's medical treatment notes and school records. (R. 38.)  And as discussed above, the ALJ did not err in discounting Ms. Gauthier's opinion because it was largely based on Plaintiff's subjective reporting.  20 C.F.R. §§ 404.1529(a), 416.929(a) (benefits may not be awarded based solely on subjective reports).  The Court therefore finds no error in the ALJ's analysis of the third-party statements and again declines Plaintiff's invitation to reweight the evidence.  *Schmitt*, 27 F.4d at 1361.  Because the ALJ applied the correct legal standards and substantial evidence supports his evaluation of the statements at issue, the Court affirms the ALJ's findings.  *Vossen*, 612 F.3d at 1015.

**B.     Alleged Step Five Errors**

At step five of the sequential analysis, the Commissioner must prove that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." 42 U.S.C. § 423(d)(2)(A).  In this case, based the second vocational expert's testimony, and considering Plaintiff's age, education, work experience, and RFC, the ALJ found Plaintiff is able to perform such other jobs, including: "table worker" (DOT #739.687-182, with around 26,000 jobs in the national economy); "inspector" (DOT #726.684-110, with approximately 9,000 jobs in the national economy); and "sorter" (DOT #521.687-086, with approximately 9,000 jobs in the national economy).  (R. 50.)  Plaintiff argues the ALJ did not meet his burden because the jobs he identified: (1) were based on a flawed RFC; and (2) exceeded even the ALJ's allegedly flawed RFC determination.  (ECF No. 10 at 28-30; ECF No. 13 at 13-14.)

**1.     The ALJ's RFC Determination**

Plaintiff contends that because the ALJ's RFC determination was not based on substantial evidence, the ALJ's hypothetical questions to the vocational expert were flawed.  Plaintiff further argues the ALJ's reliance on the vocational expert's testimony in response to flawed hypothetical questions was improper, and Plaintiff cannot actually perform any of the jobs the vocational expert identified.  (ECF No. 10 at 28; ECF No. 13 at 12.)  But for the above-stated reasons, the Court concludes that the ALJ did not err at step four of the sequential analysis and substantial evidence supports his RFC determination.  The ALJ thus appropriately relied on the vocational expert's testimony.  *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir.1996) (a hypothetical question posted to a vocational expert need include only those impairments that the ALJ has found are substantially supported by the record as a whole).

## 2.      The Jobs Identified

Plaintiff also claims that because both the "table worker" and "sorter" positions require the use of conveyor belts, they exceed the ALJ's RFC limitation that Plaintiff cannot perform "rapid, assembly-line paced work [(daily quotas but not hourly quotas)]". (ECF No. 10 at 28, citing R. 38, RFC determination; DICOT, Table Worker, 739.687-1821991, 1991 WL 680217 and DICOT, Sorter, 521.687-086, 1991 WL 674226, DOT job descriptions for "table worker" and "sorter"; ECF No. 13 at 13.) Plaintiff further contends they cannot perform the job of "inspector" because it requires sustained concentration, persistence, and pace, and "[a] person who is limited to simple, routine, repetitive tasks could not be expected to perform such a highly precise, technical job on a regular and sustained basis." (ECF No. 10 at 28, citing DICOT, Inspector, 521.687-086, 1991 WL 674226.) Plaintiff contends the ALJ erred by failing to explain how Plaintiff could perform the jobs the vocational expert identified in light of the job requirements listed in the DOT, as required by SSR 00-4p, 2000 WL 1898704 (SSA), such that the ALJ did not meet his burden at step five. (ECF No. 10 at 28-29; ECF No. 13 at 14.) Plaintiff further argues that "all three occupations require frequent reaching, handling, and fingering, and the ability to sustain full time work, which exceeds Plaintiff's abilities due to their combined impairments, including fibromyalgia, migraines, and anxiety" (ECF No. 10 at 28), and suggests in a footnote that none of the identified jobs exists in significant numbers in the national economy (ECF No. 10 at 28 n.10).

Plaintiff is correct that an ALJ must explain any deviation between a vocational expert's testimony and the DOT. SSR 00-4p, 2000 WL 1898704 (SSA), at *4. But here, the Court cannot conclude that use of a conveyor belt necessarily implies "rapid" work, as prohibited by Plaintiff's RFC. Plaintiff does not support their speculation that every conveyor belt moves quickly or that

use of a conveyor belt conflicts with their ability to meet daily quotas. The Court similarly declines to indulge Plaintiff's unsupported speculation that Plaintiff cannot perform the job of "inspector" because it exceeds Plaintiff's ability to concentrate, persist, or maintain pace. Finding no discrepancy between the vocational expert's testimony and the DOT job descriptions, the Court cannot conclude that the jobs the ALJ identified exceed Plaintiff's RFC, or that the ALJ owed any additional explanation to support his findings.

Plaintiff's remaining arguments similarly fail. Having already concluded that substantial evidence supports the ALJ's RFC, the Court declines to address any implication that it should have included greater limitations or was flawed in any way.

As for Plaintiff's assertion—stated in a footnote—that it is unclear whether any of the jobs the ALJ identified exist in significant numbers in the national economy, the Eighth Circuit "ultimately leave[s] to the trial judge's common sense the application of the significant numbers requirement to a particular claimant's factual situation." *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997). There is a split in the Eighth Circuit regarding how to apply the "common sense approach." *Shari B. v. Kijakazi*, No. 22-CV-1539 (DJF), 2023 WL 6130679, at *7–9 (D. Minn. Sept. 19, 2023) (explaining that some courts require direct evidence of a significant number of jobs in the claimant's region or in "several regions", while others find that evidence of jobs existing nationally is sufficient, so long as there is nothing regionally limiting about the job itself). Based on its survey of case law from around the country, this Court observed in *Shari B.* that "many courts draw the line between a 'significant' and an insignificant number of jobs in the national economy—without evidence of the number of jobs available locally—at around 20,000 jobs." *Id.* at *8.

Adopting that analysis here, this case is not a close call.  The ALJ identified a total of 44,000 jobs in the national economy.  Though the ALJ did not evaluate whether any of them existed in the local or regional economies (R. 50), given the Eighth Circuit's emphasis on flexibility, *Hall*, 109 F.3d at 1259, and finding nothing inherently limiting about any of the jobs the ALJ identified, the Court finds 44,000 jobs nationally to be a significant number and thus concludes the ALJ still met his step five burden.  *See, e.g.*, *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000 jobs in the national economy was a close call but met the significant numbers requirement); *Nicolas C. J. v. Kijakazi*, 20-cv-1340 (WMW/ECW), 2022 WL 1109810, at *25 (D. Minn. Jan. 20, 2022) (finding 20,500 jobs nationally to be a significant number) (citation omitted), *report and recommendation adopted*, 2022 WL 807605 (D. Minn. Mar. 17, 2022);  *Garcia v. Comm'r, SSA*, 817 F. App'x 640, 649–50 (10th Cir. 2020)  (finding 22,000 jobs sufficient).

The Court therefore rejects each of Plaintiff's challenges to the ALJ's Decision and finds that it is supported by substantial evidence in the record as a whole.  For these reasons, the Court finds no basis to grant the relief Plaintiff seeks and affirms the ALJ's Decision.

## ORDER

Based on all the files, records, and proceedings herein, **IT IS ORDERED** that:

1.      Plaintiff's Request for Relief (ECF No. 10) is **DENIED**;

2.      Defendant's Request for Relief (ECF No. 12) is **GRANTED**; and

3.      This matter is **DISMISSED WITH PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 21, 2024

s/ Dulce J. Foster
DULCE J. FOSTER
United States Magistrate Judge